UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

TIMOTHY COLLINS,

                 Plaintiff,

                                 **MEMORANDUM & ORDER**

      v.                           11-CV-5023 (MKB)

COMMISSIONER OF SOCIAL SECURITY,

                 Defendant.

-----------------------------------------------------------------x

MARGO K. BRODIE, United States District Judge:

        Plaintiff Timothy Collins filed the above-captioned action against Defendant

Commissioner of Social Security, seeking review pursuant to 42 U.S.C. § 405(g) of the

Commissioner's decision denying Plaintiff disability benefits.  Plaintiff applied for disability

benefits on November 30, 2009.  Plaintiff's application was denied, and he requested a hearing

before an Administrative Law Judge ("ALJ").  The ALJ found that Plaintiff was not disabled.

The Appeals Council denied Plaintiff's request for review, making the ALJ decision the final

decision of the Commissioner.  Plaintiff timely filed the instant action.  Defendant moves for

judgment on the pleadings.  The Court heard argument on January 14, 2013.  For the reasons set

forth below, Defendant's motion for judgment on the pleadings is denied, and the

Commissioner's decision is reversed and remanded for further proceedings.

    **I.**    **Background**

        Plaintiff was born in 1948.  (R. at 151.)  Plaintiff's highest level of education is high

school.  *Id.* at 161.  Plaintiff filed for disability insurance benefits on November 30, 2009,

claiming that he became eligible on May 30, 2009.  *Id.* at 151–53.  Plaintiff stated that he suffers

from "high blood pressure; pain in back, knees, feet, neck, shoulders, elbows, hips and lower spine; vibrations in hips, thighs, calves and feet; continuous headaches; allergic rhinitis; bone spurs; compacted and herniated disks; weak heart valve." *Id.* at 155.  Plaintiff claimed that he has difficulty walking, lifting and carrying, which resulted in his inability to continue working. *Id.* at 155–57.  Plaintiff's application was denied, and he timely requested a hearing before an ALJ.  *Id.* at 68–73, 75–79.  A hearing was held on January 21, 2011.  *Id.* at 32.  Plaintiff provided the only testimony at the hearing.

### a.  Plaintiff's Testimony

Plaintiff testified that in May or June of 2009 he fell down the steps at his home and lost consciousness.[1]  *Id.* at 38.  A CAT scan revealed that Plaintiff had a stroke.  *Id.*  Plaintiff testified that he experiences pain in both of his arms, which is similar to being "shocked like lightening pains."  *Id.*  Although Plaintiff feels the pain frequently, he is so accustomed to it that he is not sure if it is constant.  *Id.*  Plaintiff described the pain as a seven, on a scale from one to ten.  *Id.* at 38–39.  Plaintiff testified that the pain can occur when he is sitting or standing.  *Id.* at 39. Plaintiff also testified that he gets vibrations in his thighs, knees, calves, heels and the bottom of his feet, which feel like a "cell phone going off on vibrate."  *Id.* at 40.  Plaintiff testified that if he sits long enough, he gets increasing pain in the buttocks and the pain travels down his legs to his feet.  *Id.* at 41.  Plaintiff said he buys a half gallon of milk, instead of a gallon, because he has difficulty holding a gallon of milk.  *Id.* at 39.  Plaintiff testified that he has no difficulty shaving or combing his hair, but he has problems with balance in the shower.  *Id.* at 49–50.  When he showers, he has to lift his leg and rest it on the side of the tub in order to wash his leg.  *Id.*

---

[1] Plaintiff did not specify when this fall occurred, but medical records from Dr. Jeffrey Mallin, a neurologist that treated Plaintiff, indicate that the fall occurred in May or June of 2009, around the time when Plaintiff claims that he became disabled.  (R. at 311.)

2

Plaintiff takes Neurontin to treat the pain — two pills in the morning, two pills in the evening, 1,000 mg a pill. *Id.* at 41. He also takes ibuprofen for the pain. *Id.* at 43. The ibuprofen is prescribed, 400 mg. *Id.* Plaintiff takes Vasotec for his blood pressure. *Id.* As a result of the Neurontin, Plaintiff suffers from "word retrieval difficulty" and "depression." *Id.* at 42. When the ALJ questioned Plaintiff about his use of the word "depression," Plaintiff clarified that he was using depression to describe his sleeping issues. *Id.* Plaintiff testified that he only sleeps three to four hours a night because of the pain. *Id.* Plaintiff takes Ambien to help with his sleeping issues. *Id.* at 43. At one point he was taking it every night, but now he only takes it if he has had trouble sleeping for a couple of days. *Id.* Plaintiff uses BioFreeze on his neck, back, knees and feet. *Id.* at 46. BioFreeze brings Plaintiff's pain to a four or five, but his pain always returns. *Id.* He uses BioFreeze three times a day. *Id.* at 47.

Plaintiff can walk about two blocks or two-tenths of a mile before he needs to sit down. *Id.* at 61–62. Plaintiff sometimes walks to the train station, which is two blocks from him, and, when he does, it takes him about ten minutes. *Id.* at 62. Plaintiff can stand for approximately five or ten minutes before he needs to lean on or rest against something, and he can sit for about 20 minutes before he needs to either get up and move around or lie down. *Id.* at 64. He guessed that if he had a job where he was allowed to sit for 20 minutes, stand for 5 or 10 minutes and then sit again, he could last at the pace for two or three hours. *Id.* After two or three hours, Plaintiff would need to lie down. *Id.* Plaintiff testified that he can lift about ten pounds. *Id.* at 65.

Plaintiff testified that he lives with his ex-wife and two children, who are 17 and 20. *Id.* at 47. When Plaintiff goes to the bathroom, he sits on the toilet, as opposed to standing, and uses the sink to the left of the toilet as leverage to get up. *Id.* at 49. Plaintiff does not have trouble

3

cleaning himself, aside from needing to use the side of the bath tub to rest his leg in the shower. *Id.* at 49–50.  Plaintiff does not have any difficulty dressing except buttoning his shirts if it has small buttons.  *Id.* at 50.  Plaintiff's room is on the second floor, and there are 12 stairs that divide the floors.  *Id.* at 51.  Whenever Plaintiff goes up and down the stairs, he uses the bannister because he favors his right leg.  *Id.* at 52.

Every day, Plaintiff goes on the computer to update the real estate listing on his house, which, at the time of the hearing, had been on the market for five or six months.  *Id.* at 52–53. Plaintiff does not have any other real estate listings.  *Id.* at 52.  Plaintiff has an agent from his old real estate office, who is marketing his house.  *Id.* at 53.  Plaintiff only updates the description of the house online.  *Id.*  Plaintiff testified that he only spends about 20 minutes a day on the computer.  *Id.* at 53–55.  After using the computer, Plaintiff either goes to the couch or goes upstairs and lies down.  *Id.* at 55.  He stated that lying down relieves the pain in his lower back. *Id.*  Plaintiff testified that between 8 a.m. and 5 p.m. he spends about four to five hours lying down.  *Id.* at 61.  When Plaintiff goes to the pharmacy to pick up his prescriptions, if he has to wait in line, he has to lean on something to hold himself up because of the pain.  *Id.*  Plaintiff testified that he goes outside sometimes in the summer but not in the winter.  *Id.* at 57.  He drives to the doctor and the chiropractor, when he has appointments.  *Id.* at 59.  Plaintiff said that his ex-wife does almost all of the chores, although he occasionally drives to get milk or cereal, gas or the car washed.  *Id.* at 59–60.

### b.  Plaintiff's Employment History

Plaintiff retired from the New York City Department of Sanitation in 1989 and is now on disability pension.  *Id.* at 47.  Plaintiff walked into a telephone spike, fell down and two weeks later could not walk because he had chipped a bone in his back.  *Id.* at 48.  From 1990 until May

of 2009, Plaintiff worked as a real estate agent. *Id.* at 35, 44. As a real estate agent, Plaintiff would stage and attend open houses, seek out real estate listings and go door to door soliciting listings. *Id.* at 44. Plaintiff testified that he started stumbling, when he was coming out of people's houses, and he realized that he could not continue working. *Id.* Plaintiff also worked as a concierge for a high end condominium. *Id.* As a concierge, Plaintiff sat at a desk, watched security cameras, walked around the property every couple of hours to check for theft, received packages from FedEx, delivered packages to apartments and opened the door for people. *Id.* at 44–45. Plaintiff testified that he left the job because he could not get comfortable sitting, his neck hurt and the air conditioning was uncomfortable. *Id.* at 45.

### c. Medical Evidence

#### i. Norman Riegel (Treating Physician)

Norman Riegel, M.D., has been treating Plaintiff for 20 years. *Id.* at 36. Riegel submitted a pain questionnaire, rest questionnaire and medical assessment of Plaintiff's ability to do work-related activities. *Id.* at 314–17. In response to a question regarding the pain that Plaintiff experiences, Riegel checked "Severe: Extreme impairment of ability to function." *Id.* at 314. Riegel checked "Yes" in response to a question regarding whether Plaintiff's complaints of pain were consistent with his objective findings. *Id.* Riegel selected "Constantly (67–100% of the time)" in response to a question asking how frequently pain interferes with Plaintiff's ability to maintain attention and concentration and complete tasks. *Id.* In "Other Comments," Riegel wrote that "patient cannot enter gainful employment." *Id.*

On the rest questionnaire, Riegel indicated that Plaintiff "requires complete freedom to rest frequently without restriction." *Id.* at 315. On the medical assessment of Plaintiff's ability to perform work-related activities, Riegel indicated that in an eight-hour day, Plaintiff could only

sit for one hour and stand or walk for one hour. *Id.* at 316. Riegel also indicated that Plaintiff could not perform any of these activities for a "steady" hour. *Id.* Riegel indicated that Plaintiff could "never" lift or carry any object, regardless of the weight, and did not have any capacity to climb, kneel, crouch, stoop, balance or crawl. *Id.* Riegel listed his medical findings as "chest pain, shortness of breath, hypertension." *Id.* Regarding physical functions, Riegel indicated that Plaintiff's ability to reach, handle and push and pull were affected by his impairment. *Id.* at 317. Riegel stated that these functions were affected because of Plaintiff's "palpitations and chest pain." *Id.* Regarding environmental restrictions, Riegel indicated that Plaintiff should avoid heights, noise, dust, fumes, vibration, moving machinery, temperature extremes, humidity and chemicals. *Id.* Riegel noted that all of these conditions can cause stress, and stress makes Plaintiff's medical condition worse. *Id.* In additional impairments, Riegel noted that Plaintiff has "neck disc herniations, kidney cpts, chest pain, headaches, decreased range of motion." *Id.*

Riegel did not provide any of his underlying treatment notes or any medical records, aside from a handful of laboratory results. *Id.* at 342–52. For the most part, Riegel merely checked answers to questions on the various forms and provided little to no substance. *Id.* Where Riegel did offer explanations, his descriptions of Plaintiff's impairments emphasized Plaintiff's heart condition. *Id.* at 316–17. Riegel only mentioned Plaintiff's neck and back pain in the additional comments portion of his form. *Id.* at 317. At the hearing, the ALJ asked Plaintiff where Riegel's medical records were for his treatment of Plaintiff, and Plaintiff's representative informed the ALJ that they had requested Plaintiff's records from Riegel and submitted everything they received, which was "basically a line of tests." *Id.* at 36. The ALJ responded that "[Riegel's] out totally without anything to substantiate it. It's not very strong. . . . [S]o I mean we might have to go into post on this case." *Id.* at 37.

6

ii.  **Jeffrey Mallin (Neurologist)**

Riegel referred Plaintiff to Jeffrey Mallin, M.D., a neurologist, who examined Plaintiff on two occasions in January and February of 2010.  *Id.* at 299–312.  On January 8, 2010, Mallin performed a neurological examination of Plaintiff.  *Id.* at 311.  Mallin noted that Plaintiff had fallen six or seven months prior to the examination and, since the fall, was experiencing headaches and radiating pain in his extremities.  *Id.*  Mallin concluded that Plaintiff's neurological examination was essentially normal; however, he did observe the presence of a diminished range of motion, "especially in the lateral rotation both to the right and to the left and trigger points identified along the bilateral trapezius and supraclavicular."  *Id.* at 312.  Mallin noted that, since Plaintiff fell and struck his head, he had "been experiencing discomfort in the cervical region but especially radiation to the right upper extremity and sense of occasional numbness or paresthesis in the arms or the hands but an odd sense of vibration in the limbs more so on the right side of his body."  *Id.*

Mallin had a doctor in his office, Punam Prabhakar, conduct electrodiagnostic studies of Plaintiff.  *Id.* at 299–300.  Prabhakar conducted the study on January 17, 2010 and found the study to be "abnormal" and "suggestive of bilateral mild carpal syndrome, a mild sensorimotor polyneuropathy, and suggestion of a left ulnar neuropathy at the elbow."  *Id.* at 302.  Prabhakar also found the study suggestive of C4-C5 cervical radiculopathy and L4-L5, L5-S1 radiculopathy, a nerve condition that can result in pain and weakness.  *Id.*  Mallin examined Plaintiff again on February 17, 2010, noting that Plaintiff had stated that "today [was] a good day but most of his days, he has a great deal of pain in the upper extremities and/or lower extremities or all four."  *Id.* at 299.  Mallin also noted that "[a]t this time, the patient has a great deal of discomfort in the limbs and radicular pain and what he describes as a 'buzzing sensation.'"  *Id.*

Mallin prescribed Neurontin for Plaintiff, and instructed Plaintiff to return to the office in five

weeks and to remain under medical surveillance.  *Id.*

### iii.  David Fuggetta (Chiropractor)

David Fuggetta is a chiropractor that has been treating Plaintiff three to four times a week

since April 20, 2006.  *Id.* at 224.  Fuggetta examined Plaintiff on January 7, 2010 and diagnosed

him with, among other things, a disc disorder and radiculopathy.  *Id.*  Fuggetta found that

Plaintiff has a "permanent lumbar injury" and that his "prognosis is poor." *Id.* at 225.  Fuggetta

noted that Plaintiff's gait did not have a significant abnormality but that walking increases

Plaintiff's complaint of pain.  *Id.* at 227.  Based on the examination, Fuggetta found that Plaintiff

could lift no more than five pounds, occasionally (up to 1/3 of a work day); walk no more than

two hours a day; and sit no more than six hours a day.  *Id.*  Fuggetta also noted that Plaintiff's

ability to push and pull is limited because of weakness in his arms.  *Id.* at 228.

### iv.  Evelyn Wolf (Consultative Examiner)

Evelyn Wolf, M.D., a consultative examiner, saw Plaintiff on February 9, 2010.  *Id.* at

270.  Wolf noted in her report that Plaintiff's gait was normal, and he "appear[ed] to be in no

acute distress." *Id.* at 271.  During the examination, Plaintiff had "difficulty walking on his heels

and toes and fully squatting." *Id.*  However, Plaintiff did not use any assistive devices and did

not need help changing for the exam.  *Id.*  He was able to get on and off the exam table and rise

from his chair without difficulty.  *Id.*  Wolf found that Plaintiff had the full range of motion of

his shoulders, elbows, forearms, wrists, cervical spine and ankles.  *Id.* at 272.  Wolf noted that x-

rays revealed degenerative changes in Plaintiff's lower spine and mild osteoarthritis in his left

knee.  *Id.*  Based on the foregoing, Wolf diagnosed Plaintiff as follows:  (1) "diskogenic" back

disease, (2) bilateral knee pain, (3) hypertension, (4) bilateral carpal tunnel syndrome, (5)

8

headaches, and (6) prostate cancer.[2]  *Id.* at 273.  Wolf indicated that Plaintiff's prognosis was "stable."  *Id.*  Wolf concluded:  "In my opinion, this claimant is minimally limited in walking and standing.  Moderately limited for climbing.  No limitation in sitting provided he can stretch from time to time.  He is moderately limited for lifting.  There is no limitation on use of his hands for fine and gross activities."  *Id.*

### v.  Residual Functional Capacity Assessment

The residual functional capacity ("RFC") assessment, which is based on the evidence in Plaintiff's file, diagnosed Plaintiff with discogenic disc disease and found that he was able to lift twenty pounds occasionally and ten pounds frequently, stand six hours a day, sit six hours a day and do an unlimited amount of pushing and pulling.  *Id.* at 257–58.  The RFC assessment noted that Plaintiff's x-rays "show mild degenerative changes" in his lumbar spine and "mild osteoarthritis" in his left knee.  *Id.* at 258.  The RFC assessment referenced Wolf's observations that Plaintiff's gait was normal but that he had difficulty walking on his heels and toes and squatting.  *Id.*  The RFC assessment also referenced Wolf's observations that Plaintiff did not need help changing or getting on and off the exam table and that Plaintiff was able to rise from his chair without difficulty.  *Id.*  The RFC assessment noted that Plaintiff had limited range of motion in his lumbar spine.  *Id.*  The RFC assessment found that Plaintiff occasionally, i.e. one third of the time, had limitations in the following areas:  climbing ramps or stairs, balancing, stooping, kneeling, crouching and crawling.  *Id.* at 259.  The RFC assessment noted that there was a statement from a treating or examining source on file, but the conclusions of the treating source regarding Plaintiff's limitations or restrictions were not significantly different from the consultative examiner's assessment.  *Id.* at 261.  The RFC assessment concluded that Plaintiff

---

[2] Plaintiff had a radical prostatectomy in 2001.  (R. at 273.)

was limited to light work and could return to his past work and recommended denying his

application.  *Id.* at 262.  The RFC assessment found that Plaintiff's statements regarding his

limited daily activities were credible but not to the degree alleged.  *Id.*

### vi.  Other Medical Evidence

The record also contained records from Richard Rizzuti, M.D., a radiologist that

performed various tests on Plaintiff in 2009 and 2010, including a magnetic resonance imaging

("MRI") and computer tomography ("CT") of Plaintiff's brain, a MRI of his cervical spine, and a

sonogram of Plaintiff's abdomen.  *Id.* at 294–98, 310.  On June 12, 2009, a CT of Plaintiff's

brain showed a "lucency within the left cerebellar hemisphere . . . suggesting a small infarct."

*Id.* at 296.  Rizzuti recommended that Plaintiff have a MRI.  *Id.*  On January 20, 2010, Plaintiff

had a MRI of his brain, which showed a "[s]mall cerebellar infarct."  *Id.* at 294.  Plaintiff also

had a MRI of his cervical spine on January 19, 2010.  *Id.* at 310.  The MRI of Plaintiff's cervical

spine showed "disc herniations at C5-6 and C6-7 abutting the anterior aspect of the spinal cord

and impinging on the left intervertebral foramen at C5-6 and on the right intervertebral foramen

at C6-7."  *Id.*

### d.  The ALJ's Decision

The ALJ conducted the five-step sequential analysis.  First, the ALJ found that Plaintiff

had not engaged in substantial activity since May 30, 2009.  *Id.* at 22.  The ALJ noted that

Plaintiff testified that he is selling his house and that he "does comps" on other houses, finding

that such activity was not substantial gainful activity but was "inconsistent with the claimant's

allegations of disability."  *Id.*  Second, the ALJ found that Plaintiff had the following severe

impairments:  cervical pain, lower back pain and knee pain.  *Id.*  The ALJ determined that these

impairments "cause significant limitations on [Plaintiff's] ability to perform basic work activity."

*Id.*  Third, the ALJ found that Plaintiff did not have an impairment listed in Appendix 1 of the regulations.  *Id.*  The ALJ specifically considered Listings 1.02 and 1.04 and determined that the severity of Plaintiff's impairments did not rise to the level of either listing.  *Id.* at 22–23.

Fourth, the ALJ found that Plaintiff "has the residual functional capacity to perform the full range of light work."  *Id.* at 23.  The ALJ found that  "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment."  *Id.*  The ALJ found that the "[o]bjective medical evidence has been unremarkable."  *Id.*  The ALJ found that Plaintiff's description of his symptoms was not supported by Wolf's evaluation.  *Id.* at 24 ("During an evaluation of the claimant, Dr. Wolff [sic] observed the claimant to be in no acute distress and that he exhibited a normal gait and station and no difficulty changing for the exam, getting on and off the exam table, and rising from a chair.").  The ALJ noted that Wolf found that Plaintiff had "full range of motion in the cervical spine, lumbar spine flexion and extension of zero to 60 degrees."  *Id.*  The ALJ also found that Plaintiff's claims were inconsistent with the findings of Mallin, the neurologist.  *Id.* at 24.  Mallin found in his examination that Plaintiff had "a normal gait and station, a supple neck with no evidence of meningismus, no lumbar punch percussion tenderness, a negative straight leg raising test, and normal muscle tone and 5/5 muscle strength throughout."  *Id.*  Mallin did find that Plaintiff had a "diminished range of motion of the cervical paraspinous musculature."  *Id.*  The ALJ gave "significant weight to the opinion of Dr. Wolff [sic], as it is supported by and consistent with the substantial evidence of record."  *Id.*

With regard to Plaintiff's medical evidence, the ALJ found that the opinions of Plaintiff's treating physician and chiropractor were not supported by the substantial evidence. *Id.* at 24–25. The ALJ "decline[d] to give controlling weight to the opinion of Norman Riegel, M.D., a treating primary care physician and cardiologist, that the claimant [could not] lift or carry any weight, sit, stand, walk no more than an aggregate of 1 hour in an 8 hour day, and [was] completely precluded from climbing, kneeling, crouching, stooping, balancing, and crawling, as it [was] not supported by the substantial evidence." *Id.* at 24 (citations omitted). The ALJ also noted that "although the claimant testified that Dr. Riegel has been treating him for the past twenty years, the record contains no treatment notes for the claimant's alleged impairments other than a few recent laboratory tests." *Id.* Although the ALJ declined to give Riegel's opinion controlling weight, he did not specify what weight, if any, he was giving Riegel's opinion. *Id.*

The ALJ also declined to give controlling weight to Plaintiff's chiropractor, David Fuggetta, "because he [was] not an acceptable medical source." *Id.* Moreover, the ALJ "accord[ed] little weight Dr. Fusetta's [sic] opinion that the claimant [could] only lift or carry up to 10 pounds, stand or walk up to 2 hours, and [could not] sit up for 6 hours in an 8 hour day, as it [was] not consistent with the substantial evidence of record." *Id.* The ALJ concluded that Plaintiff could perform his past relevant work as a concierge and as a real estate agent, and this "work did not require the performance of work-related activities precluded by the claimant's residual function capacity." *Id.* at 25. Having found that Plaintiff could perform his past work, the ALJ did not need to reach step five.

12

## II.  Discussion

### a.  Standard of Review

"In reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision." *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004); *see also Selian v. Astrue*, No. 12-871, --- F.3d ----, 2013 WL 627702, at *6 (2d Cir. Feb. 21, 2013).  Substantial evidence requires "more than a mere scintilla." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (quoting *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008)).  "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citation omitted). Once an ALJ finds facts, the court "can reject those facts only if a reasonable factfinder would *have to conclude otherwise*." *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012) (emphasis in original) (citations and internal quotation marks omitted).  In deciding whether substantial evidence exists, the court "defer[s] to the Commissioner's resolution of conflicting evidence." *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012).  The Commissioner's factual findings "must be given conclusive effect so long as they are supported by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citation and internal quotations omitted).

If, however, the Commissioner's decision is not supported by substantial evidence or is based on legal error, a court may set aside the decision of the Commissioner.  *McCall v. Astrue*, No. 05 Civ. 2042, 2008 WL 5378121, at *8 (S.D.N.Y. Dec. 23, 2008); *see Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998).  "In making such determinations, courts should be mindful that '[t]he Social Security Act is a remedial statute which must be 'liberally applied'; its intent is

inclusion rather than exclusion.'"  *McCall*, 2008 WL 5378121, at *8 (quoting *Rivera v. Schweiker*, 717 F.2d 719, 723 (2d Cir. 1983)).

> **b.  Availability of Benefits**

Federal disability insurance benefits are available to individuals who are "disabled" within the meaning of the Social Security Act (the "Act").  To be eligible for disability benefits under the Act, the plaintiff must establish his or her inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The impairment must be of "such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).  The Commissioner has promulgated a five-step analysis for evaluating disability claims.  20 C.F.R. § 404.1520.  The Second Circuit has described the steps as follows:

> The first step of this process requires the [Commissioner] to determine whether the claimant is presently employed.  If the claimant is not employed, the [Commissioner] then determines whether the claimant has a "severe impairment" that limits her capacity to work.  If the claimant has such an impairment, the [Commissioner] next considers whether the claimant has an impairment that is listed in Appendix 1 of the regulations.  When the claimant has such an impairment, the [Commissioner] will find the claimant disabled.  However, if the claimant does not have a listed impairment, the [Commissioner] must determine, under the fourth step, whether the claimant possesses the residual functional capacity to perform her past relevant work.  Finally, if the claimant is unable to perform her past relevant work, the [Commissioner] determines whether the claimant is capable of performing any other work.  If the claimant satisfies her burden of proving the requirements in the first four steps, the burden then shifts to the [Commissioner] to prove in the fifth step that the claimant is capable of working.

*Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)).

### c.  Analysis

Defendant now moves for judgment on the pleadings, arguing that the Commissioner's decision is supported by the substantial evidence in the record.  Plaintiff argues that the Commissioner's decision is not supported by substantial evidence and is contrary to law.  (Pl. Opp'n 6.)  Plaintiff argues that the ALJ made the following legal errors:  (1) failing to give the opinion of Plaintiff's treating physician, Riegel, controlling weight, and (2) disregarding the opinion of Plaintiff's chiropractor, Fuggetta, because he is not an acceptable medical source as defined under 20 C.F.R. § 404.1513(a).[3]  (Pl. Opp'n 9–12.)

### i.  Duty to Develop the Record and the Treating Physician Rule

Plaintiff argues that the ALJ erred in declining to give controlling weight to Riegel's opinion without first attempting to obtain the relevant medical records.[4]  (Pl. Opp'n 9.)  Before

---

[3] Plaintiff also claims that the ALJ arbitrarily disregarded Plaintiff's testimony regarding the severity of his impairments.  (Pl. Opp'n 12.)  The ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment."  (R. at 23.)  In assessing the credibility of a claimant's subjective assertions of pain, the ALJ must consider "statements the claimant or others make about his impairment(s), his restrictions, his daily activities, his efforts to work, or any other relevant statements he makes to medical sources during the course of examination or treatment, or to the agency during interviews, on applications, in letters, and in testimony in its administrative proceedings."  *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (alterations omitted) (citing 20 C.F.R. § 404.1512(b)(3)).  The ALJ properly considered these factors and determined that Plaintiff's description of his impairment was not credible to the extent that Plaintiff claims that he cannot perform light work.  *Id.* at 24.  Plaintiff's contention that the ALJ arbitrarily disregarded his subjective assessments of pain is without merit.

[4] Plaintiff argues, initially, that the ALJ should have given Riegel's opinion controlling weight, even with the limited evidence in the record.  (Pl. Opp'n 9–10.)  Riegel's opinion consisted of checked boxes on questionnaires and a few handwritten responses.  Riegel did not

determining whether the Commissioner's decision is supported by substantial evidence, the court "must first be satisfied that the claimant has had a full hearing under the regulations and in accordance with the beneficent purposes of the Act." *Moran*, 569 F.3d at 112 (alterations omitted) (quoting *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990)); *see also Perez*, 77 F.3d at 47 ("Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record."). An ALJ's "failure to develop the record adequately is an independent ground for vacating the ALJ's decision and remanding the case." *Green v. Astrue*, No. 08 Civ. 8435, 2012 WL 1414294, at *14 (S.D.N.Y. Apr. 24, 2012) (citing *Moran*, 569 F.3d at 114–15), *report and recommendation adopted*, 2012 WL 3069570 (S.D.N.Y. July 26, 2012).

The ALJ's duty to develop the record "works in tandem" with the treating physician rule, "which requires the ALJ to give controlling weight to the opinion of a claimant's treating physician if the opinion is well supported by medical findings and is not inconsistent with other substantial evidence." *Wiebicke v. Astrue*, No. 10 Civ. 3371, 2012 WL 2861681, at *11 (S.D.N.Y. July 2, 2012) (quoting *Rosado v. Barnhart*, 290 F. Supp. 2d 431, 438 (S.D.N.Y. 2003)); *see also Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011) ("The opinion of a treating physician is accorded extra weight because the continuity of treatment he provides and the doctor/patient relationship he develops place him in a unique position to make a complete and accurate diagnosis of his patient." (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983))). "Because of the considerable weight ordinarily accorded to the opinions of

_____

provide any underlying treatment notes or medical records, aside from a couple pages of test results. The ALJ properly found, based on the record before him, that Riegel's opinion was inconsistent with the substantive evidence and not supported by medical evidence. *See* 20 C.F.R. § 404.1527(c)(2); *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002). As a result, the Court will only discuss Plaintiff's claim that the ALJ had a threshold duty to develop the record before reaching this conclusion.

16

treating physicians, an ALJ's duty to develop the record on this issue is 'all the more

important.'" *Rocchio v. Astrue*, No. 08 Civ. 3796, 2010 WL 5563842, at *11 (S.D.N.Y. Nov. 19,

2010) (citation omitted), *report and recommendation adopted*, 2011 WL 1197752 (S.D.N.Y.

Mar. 28, 2011).  Accordingly, the ALJ has a threshold duty to adequately develop the record

before deciding the appropriate weight to give the treating physician's opinion.  *Burgess*, 537

F.3d at 129 ("[A]n ALJ cannot reject a treating physician's diagnosis without first attempting to

fill any clear gaps in the administrative record."  (quoting *Rosa v. Callahan*, 168 F.3d 72, 79 (2d

Cir. 1999))); *Hinds v. Barnhart*, No. 03 Civ. 6509, 2005 WL 1342766, at *10 (E.D.N.Y. Apr. 18,

2005) ("The requirement that an ALJ clarify a treating source's opinion that a claimant is unable

to work is part of the ALJ's affirmative obligation to develop a claimant's medical history.").

        During the hearing, the ALJ asked Plaintiff where Riegel's medical records were for his

treatment of Plaintiff.  (R. at 36.)  Plaintiff's representative informed the ALJ that Plaintiff had

requested his records from Riegel and submitted everything he received, which was "basically a

line of tests."  *Id.*  The ALJ responded:

> I would assume he has notes.  I would assume that he has, you know, other than
> just a medical source statement that says basically he's out totally[,] without
> anything to substantiate it.  It's not very strong.

*Id.* at 37.  The ALJ then said that "we might have to go into post on this case" in order to obtain

the necessary documents.  *Id.*  The ALJ did not take any steps to obtain additional medical

records from Riegel and, instead, simply declined to give controlling weight to Riegel's opinion.

*Id.* at 24.  In his decision, the ALJ noted, as he had at the hearing, that the record did not include

any medical documentation to support Riegel's opinion.  *Id.* at 24, 37.  The ALJ had an

affirmative duty to seek additional documents from Riegel before determining the weight to give

17

Riegel's opinion.[5]  *See Oliphant v. Astrue*, No. 11 Civ. 2431, 2012 WL 3541820, at *20 (E.D.N.Y. Aug. 14, 2012) ("[I]f an ALJ believes that a treating physician's opinion lacks support or is internally inconsistent, he may not discredit the opinion on this basis but must affirmatively seek out clarifying information from the doctor."  (citing *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998))).

The Court, therefore, finds that the ALJ committed a legal error in failing to seek additional records from Riegel before declining to give controlling weight to Riegel's opinion, in part, because of the absence of medical records.  *See Tavarez v. Barnhart*, 124 F. App'x 48, 50 (2d Cir. 2005) (noting that on remand the ALJ is required to develop the record before disregarding the treating physician's report as "deficient in detail"); *Valerio v. Comm'r of Soc. Sec.*, No. 08 Civ. 4253, 2009 WL 2424211, at *11 (E.D.N.Y. Aug. 6, 2009) ( "[The Commissioner] may not reject the treating physician's conclusions based solely on a lack of clear medical evidence or inconsistency without first attempting to fill the gaps in the administrative record."  (citing *Rosa*, 168 F.3d at 79)); *see also Tirado v. Astrue*, No. 10 Civ. 2482, 2012 WL 259914, at *5 (E.D.N.Y. Jan. 25, 2012) (the ALJ cannot "properly predicate a non-disability determination on the sparse nature of the record [he or she] did not adequately develop").  The Court reverses the Commissioner's decision and remands for further administrative proceedings.

---

[5] Defendant argues that "[u]nder the regulations in effect at the time of the ALJ's decision, the ALJ was only required to recontact a medical source when the evidence the Commissioner receives from the source is inadequate for the Commissioner to determine whether plaintiff is disabled."  (Def. Reply 4 (citing 20 C.F.R. § 404.1512(e) (2011).)  This provision imposes an obligation, separate and apart, from the ALJ's affirmative duty to develop the record.  *See Genovese v. Astrue*, No. 11 Civ. 02054, 2012 WL 4960355, at *19 (E.D.N.Y. Oct. 17, 2012) (describing both the ALJ's threshold duty to develop the record, as well as the ALJ's obligation to recontact medical sources if the record evidence is inadequate to determine whether a claimant is disabled); *Wiebicke v. Astrue*, No. 10 Civ. 3371, 2012 WL 2861681, at *11 (S.D.N.Y. July 2, 2012) (same).

### ii. Chiropractor's Opinion

Plaintiff also argues that the ALJ erred in disregarding the opinion of Plaintiff's treating chiropractor, David Fuggetta, because he was not an acceptable medical source. (Pl. Opp'n 11.) The ALJ declined to give Fuggetta's opinion controlling weight because a chiropractor is not an acceptable medical source. (R. at 24.) The ALJ then "accord[ed] little weight [to] Dr. Fusetta's [sic] opinion that the claimant can only lift or carry up to 10 pounds, stand or walk up to 2 hours, and cannot sit up for 6 hours in an 8 hour day, as it is not consistent with the substantial evidence of record." *Id.*

Only a "medical opinion" is entitled to controlling weight under the treating physician rule. 20 C.F.R. § 404.1527. The regulations specify five acceptable medical sources that can provide a medical opinion: licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists and qualified speech-language pathologists. 20 C.F.R. § 404.1527(a)(2). A chiropractor cannot provide a medical opinion, and, therefore, his or her opinion is not entitled to special consideration. *Diaz v. Shalala*, 59 F.3d 307, 313–14 (2d Cir. 1995); *see also Marrero v. Astrue*, No. 09 Civ. 4689, 2010 WL 3749223, at *9 (S.D.N.Y. Sept. 27, 2010) ("While the opinion of a chiropractor . . . may assist the SSA to determine the 'nature and severity' of a claimant's impairment, it is not an opinion that merits 'controlling weight' in the ALJ's analysis because it is not a 'medical opinion' according to SSA regulations." (citations omitted)). The ALJ has the discretion "to determine the appropriate weight to accord the chiropractor's opinion based on all the evidence before him," *Diaz*, 59 F.3d at 314, but the ALJ "may not flatly reject [it] without explaining his basis for doing so," *Nigro v. Astrue*, No. 10 Civ. 1431, 2011 WL 4594315, at *5 (E.D.N.Y. Sept. 30, 2011). *See also Losquadro v. Astrue*, No. 11 Civ. 1798, 2012 WL 4342069, at *16 (E.D.N.Y. Sept. 21, 2012) (finding that the ALJ

cannot disregard a chiropractor's opinion "*solely* because a chiropractor is not an acceptable medical source" (emphasis in original) (collecting cases))); *Delacruz v. Astrue*, No. 10 Civ. 05749, 2011 WL 6425109, at *17 (S.D.N.Y. Dec. 1, 2011) ("In fact, all courts agree that the opinion of a treating chiropractor . . . must be accorded *some* weight."  (emphasis in original) (alteration and internal quotation marks omitted) (collecting cases)), *report and recommendation adopted*, 2011 WL 6425101 (S.D.N.Y. Dec. 21, 2011).  In determining the weight to give a chiropractor's opinion, the ALJ may consider: "(i) how long the source has known plaintiff and frequency of treatment, (ii) how consistent the opinion is with other evidence; (iii) the degree to which the source presents relevant evidence to support an opinion; (iv) how well the source explains the opinion; (v) whether the source has a specialty or area of expertise related to the individual's impairment; and (vi) any other factors that tend to support of refute the opinion." *Losquadro*, 2012 WL 4342069, at *15.

Fuggetta has been treating Plaintiff three to four times a week since April 20, 2006, and his expertise as a chiropractor is directly relevant to Plaintiff's impairment.  (R. at 224.)  In support of his opinion, Fuggetta submitted numerous medical records and treatment notes.  *See id.* at 224–33, 283–93, 322–23.  Nevertheless, the ALJ "accord[ed] little weight" to Fuggetta's opinion because "it [was] not consistent with the substantial evidence of record."  *Id.* at 24.  The ALJ did not offer any other explanation regarding the weight he decided to give Fuggetta's opinion, despite the numerous factors suggesting that Fuggetta's opinion warranted significant weight.  Arguably, the ALJ complied with his legal obligation by specifying the weight he was giving Fuggetta's opinion and providing a reason, albeit a conclusory one, for that determination. Nevertheless, on remand, the ALJ should consider the above-mentioned factors in determining the appropriate weight to give Fuggetta's opinion, and the ALJ should set forth the basis for that

20

determination in his decision.  *See Losquadro*, 2012 WL 4342069, at *15 ("This Court cannot be certain what impact, if any, the chiropractor's opinion would have had on the ALJ's determination if it was properly considered under the [regulations'] framework.").

III.   **Conclusion**

      For the foregoing reasons, Defendant's motion for judgment on the pleadings is denied. The Court finds that the ALJ committed legal error when he failed to fulfill his affirmative duty to develop the record before determining the weight to give the treating physician's opinion.  The Commissioner's decision is reversed and this action is remanded for further administrative proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g).  The Clerk of Court is directed to close this case.


      SO ORDERED:


                s/MKB
             MARGO K. BRODIE
             United States District Judge

Dated: March 22, 2013
       Brooklyn, New York